THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* RAFAEL MARTÍNEZ RIVERA, Defendant and Appellant.

No. CR-70-25.     Decided January 22, 1971.

552

*Benicio Sánchez Castaño* and *Gustavo Adolfo del Toro* for appellant. *Gilberto Gierbolini, Solicitor General,* and *Federico Rodríguez Gelpí, Assistant Solicitor General,* for The People.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Appellant was accused of violating § 260 of the Penal Code, because on November 2, 1967, he committed lewd and lascivious acts with the body of the seven (7) year old girl I.M.S.

By a majority of 10 to 2 a jury found him guilty of said offense and after refusing him the benefit of a suspended sentence he was sentenced to serve from two (2) to five (5) years in the penitentiary. He was also sentenced to ten (10) days in jail for contempt committed in open court.

In this appeal he assigns the commission of five errors. Since in one of them he attacks the sufficiency of the evidence for the prosecution, we shall copy the summary of the same correctly made by the Solicitor General in his report:

"*Angelina Tolentino,* witness for the prosecution, testified that she lived at the Ward Sabana, Las Piedras, and that she had seen on November 2, 1967, about 6 to 6:30 p.m., at a distance of 30 feet from her house an old, light gray, two-door motor vehicle, with a simulated wheel painted on the trunk. She testified having seen defendant sideways driving the vehicle and saw when he stopped. She identified defendant in the courtroom and pictures of the automobile. She saw and heard the right door of the automobile closing. 'Afterwards' she identified the vehicle to detective Ismael Rodríguez, at the parking lot of the Caguas police station from among forty to fifty vehicles. She testified having seen Sandra Ivette Meléndez that afternoon go near her house. (Tr. Ev. 5–35.)

"*Carmen Delia Laboy Cuadrado,* witness for the prosecution, testified being on November 2, 1967, about six o'clock in the afternoon in front of a neighbor's house talking with a friend in the Ward Collores, located in Sabana, Las Piedras, when she saw defendant go by three times in front of her about ten feet away driving a light gray Valiant automobile. The latter had 'something like a wheel on the back.' This was the first time she saw defendant. The next day she identified the vehicle at the Caguas police station's parking lot. She made this identification while being alone and she stated it to detective Ismael Rodríguez. There were approximately some other twenty-five vehicles at the parking lot. She identified several pictures of the vehicle. (Tr. Ev. 36–46.)

"*María Elena Vázquez Lozada,* witness for the prosecution, testified living at the Ward Collores, located in Sabana, Las Piedras, and being on November 2, 1967, between 6 and 6:30 in the afternoon at the house of Juan de Dios Rivera in said ward talking with Angelina Tolentino, wife of the latter. Then she saw defendant go by three times in front of them driving a gray Valiant automobile with a simulated wheel on the back. She saw the vehicle stop, heard a door close, and saw the hair of a girl, commenting then 'Juan de Dios, it seems that a little girl got in that car.' She saw then that the vehicle went towards the

'road that goes to the river.' She continued testifying that she returned to her house, heard the screams of the girl Sandra Ivette Meléndez and of her mother whom she knew as she lived across from their house. She testified that she had noticed defendant as she had told her friend Angelina Tolentino 'look Angelina, a good-looking man is driving that car.' On the following day she identified the vehicle at the Caguas police station's parking lot among approximately 50 more vehicles. She made this identification alone at the request of detective Ismael Rodríguez, who remained in the station. She did not talk with anybody during the identification nor before the same. (Tr. Ev. 46–57.)

"*Ana María Rodríguez García,* testified being on November 2, 1967, at the Ward Collores, located in Sabana, Las Piedras, talking with a friend when she saw a gray Valiant automobile go by three times, driven by defendant, by the highway where she lived. She saw defendant facing her. The car attracted her attention because it looked like a toad and had a metal wheel on the back. She remembers that on November 2 was All Souls' Day. The car passed by about 5 feet away from her. (Tr. Ev. 57–62.)

"*Gilberto Ortiz Tolentino,* testified that he knew the girl Sandra Ivette Meléndez and her parents. On November 2, 1967, he was pushing a vehicle on the road that leads from the Ward Collores to Tejas when he saw Sandra going up 'the riverbank.' She was bleeding from her legs and screaming. She asked the witness to take her to her 'mommy' and he did so. The witness carried her and took her to the mother. He identified a shirt and pants stained with blood which he was wearing that day, testifying that it was the girl's blood. He testified that the girl told him that 'a man grabbed me and took me in the car and took me to the river and see what he did to me.' (Tr. Ev. 62–68.)

"*Josefina Serrano Morales,* mother of the prosecutrix, testified having sent her daughter on an errand. That when she left on November 2, 1967, from her house in Las Piedras, she was wearing clean clothes recently put on; that when they brought her she was bleeding from her legs and the clothes were stained with blood. She testified that the girl told her that a white man had stopped her to tell her that he was bringing some money to her father; that he took her in the car towards the bridge and that the man had a gray car with a wheel on the back. (Tr. Ev. 68–76.)

"*Ismael Rodríguez,* testified that he was a detective. On or about November 2, 1967, he investigated the complaint of the girl Sandra Ivette Meléndez. In the course of the investigation he found, the day after the events, a Valiant automobile in front of Delco Aluminum in Caguas, Puerto Rico, and its owner, appellant Rafael Martínez Rivera. He continued testifying that he informed defendant that he was investigating a case, that it was necessary to identify him, a thing that could be done at Delco, where defendant was working or at the police station. Defendant decided to go to the police station alone and in his own car, which he parked at the station's parking lot. Before going to the police station he was explained the nature of the investigation and his right to legal assistance and not to testify.

"At the police station, Martínez Rivera requested that the owner of Delco be called. He came with Mr. Gonzalo Barreras Varonas. The latter conferred with appellant. The suspect was then sent to his house and was asked to return on the next day.

"The witness testified that on the following day about fifteen white policemen, dressed as civilians, without sunglasses were assembled and dispersed around the room on the top floor of the police station. Martínez Rivera was placed among them. They agreed then that the girl Sandra Ivette would come into the room accompanied by Mr. Sergio Peña Clos. This attorney had been accompanying Martínez Rivera. The girl came into the room where the policemen and defendant were assembled and the girl, after going around, pointed at defendant. (Tr. Ev. 78–93, 97–105.)

"*Dr. Manuel Fernández Mena,* witness for the prosecution, testified having treated Sandra Ivette Meléndez on November 2, 1967, at the Clínica Oriente. The girl was sutured under general anesthesia for lacerations in the perineum and the hymen. He testified that the girl was anxious and screaming and that she remained six days in the hospital. (Tr. Ev. 93–95.)

"*Sandra Ivette Meléndez,* witness for the prosecution and a 10-year-old [*sic*] girl, was submitted by the judge to an intense examination to determine her capacity. She testified that on November 2, 1967, she was sent about 6 o'clock in the afternoon by her mother to a store to buy 'griffin'; that on the way she met defendant (whom she identified at the courtroom) who was coming in an automobile; that defendant stopped the car and after asking her what her parents were called and where they

lived he told her that he had 'some money' for her father; that he invited her to get into the car so as to take the 'money' to the mother; that she got in and he took her towards a bridge and there he introduced two fingers in her private parts (*pupú*) and before that he invited her to recline in the car, a thing that she did not do; that she alighted from the car and was bleeding; that she climbed uphill until she met Gilberto to whom she explained what had happened to her and he took her home." (Tr. Ev. 114–128.) (Solicitor General's Report, pp. 4 to 7.)

Appellant maintains in his first assignment that the trial court committed serious error "in permitting the prosecuting attorney to violate the provisions of § *11 of the Code of Criminal Procedure,* in permitting the Prosecuting Attorney to use sworn statements taken from witnesses for the defense who had been announced as witnesses for the defense of alibi, sworn statements having been taken from them subsequently to the filing of the information in the case at bar and after the defense of alibi had been announced, this being an error which impairs defendant's rights and a violation of the right to a fair and impartial trial."

In support of his contention he invokes the case of *People v. Superior Court, ante,* p. 95, where we established the prohibition which precludes the prosecuting attorney from taking sworn statements from the witnesses announced by the defendant as witnesses for alibi and using them in the trial.

■■ This assignment lacks merit. The cited doctrine of the case of *People* v. *Superior Court, supra,* is not applicable to cases as that of appellant, whose trials were held prior to said decision.[1] Also, said sworn statements were not admitted in evidence, and although the prosecuting attorney referred on cross-examination to some of them, it was the defense who began using them for the apparent purpose of reinforcing the credibility of two witnesses for the defense. On the other

---

[1] See *Rivera Escuté* v. *Delgado, Warden,* 92 P.R.R. 746 (1965); *Linkletter* v. *Walker,* 381 U.S. 618.

hand, it appears from the record that appellant did not challenge the use by the prosecuting attorney of the sworn statements for the reasons which were later set forth in *People* v. *Superior Court, supra,* nor has it been established, nor does it appear from the record that the fundamental rights of defendant were prejudiced.

The second assignment challenges the validity of the method followed for the identification of defendant as author of the offense.

■ It also lacks merit. We have already outlined the evidence for the prosecution. Several witnesses, besides the prosecutrix, saw defendant at the time and date of the events driving an automobile which for its special characteristics was not difficult to identify. It was so established when those witnesses, walking alone along the Caguas police station's parking lot, and without indications or aid from any person whatsoever, identified, without difficulty, among more than 25 automobiles which were there, the one which defendant was driving on the day of the events and which in effect was owned by him.

We agree with the Solicitor General that defendant's identification by the prosecutrix was done under conditions and circumstances which totally protected his rights.

The identification was performed in an ample room where defendant and about fifteen other persons were among civilians and policemen dispersed about the room and everyone in civilian clothes with clothes similar to those worn by defendant. Like defendant, the policemen were white, and were not wearing glasses. The girl came into the room accompanied only by Attorney Sergio Peña Clos. After going around the room the girl identified defendant as the author of the offense. In the identification procedure defendant was assisted by two attorneys. The identification in this case substantially complies with the requirements of law. See *People* v. *Gómez Incera,* 97 P.R.R. 243 (1969).

The refusal of the trial court to grant appellant the benefits of a suspended sentence is assigned as a fourth error. In the discussion of the error appellant alleges that the trial court was bound to permit him to examine the report of the Probation Officer and to file objections against the same.

■ We have already held that the enjoyment of a suspended sentence is a privilege and not a right, *People* v. *Bruno*, decided September 30, 1963, and that the judges are not bound by the report of the probation officer, *People* v. *Emmanuelli*, 67 P.R.R. 626 (1947), nor is it indispensable for the judge to determine the propriety of the suspended sentence, *People* v. *Arce Valentín*, 88 P.R.R. 842 (1963), it being sufficient for the judge to use his discretion in making the determination. *People* v. *Sánchez González*, 90 P.R.R. 192 (1964).

■ Like in other jurisdictions we decide that such a report is confidential[2] and the due process of law is not violated because of the fact that the court considers said report without giving defendant an opportunity to rebut the contents thereof. *Gregg* v. *United States*, 394 U.S. 489; *United States* v. *Trigg*, 392 F.2d 860; *Baker* v. *United States*, 388 F.2d 931; *Thompson* v. *United States*, 381 F.2d 664; *Hoover* v. *United States*, 268 F.2d 787; *Williams* v. *New York*, 337 U.S. 241.

The Solicitor General is correct in arguing that "the purpose of treating the report of the probation officer as confidential is to protect the persons who offer information about defendant and thus to achieve that these persons be more

---

[2] *Colón* v. *Meléndez*, 87 P.R.R. 419 (1963), invoked by appellant, is not applicable. That case dealt with a report about a study required by the court from an expert in family relations about the conditions of two homes, that of the father and that of the mother of four minor children, for the purpose of determining which of the two homes would be the most adequate one to guarantee the welfare of the children.

The court considered that report in adjudicating the custody of the children to one of the parties, within a proceeding of habeas corpus. Obviously the report could not be confidential and both parties were entitled to examine it and to make objections to the same.

accessible and feel with greater liberty to render testimony during the investigation which the probation officer performs about the family antecedents and social history of the convict. To achieve this it is necessary that the names of the persons interviewed as well as the information submitted by them be kept in a confidential manner, for otherwise the investigations performed by the probation officers would be adversely affected, all of it in prejudice of defendants themselves and of the ends contemplated by the law which authorizes suspended sentences. Also, permitting the examination and rebuttal of the probation officer's report and allowing the persons who have offered any information to be cross-examined in court would defeat the purpose of that report as it would have the effect of extending the proceeding up to the point that the report would not be of any use to guide the court in the exercise of its discretion. In any event, it must be taken into account that the report is not prepared by an adversary; that the court is conscious and considers the fact that the report contains hearsay information; and that the defendant may call the attention of the court to any factor which he deems could influence its decision. *People* v. *Peace*, 273 N.Y.S.2d 64 (1966); *People* v. *Mosher*, 5 Cr. L. 2062 (N.Y. 4-10-69); *Commonwealth* v. *Martin*, 4 Cr. L. 2481 (Mass. 2-4-69)." (Solicitor General's Report, pp. 12 and 13.)

■ The fifth and last error was not committed. The proceeding for contempt was proper at law. On March 13, 1969, the judge found defendant guilty and sentenced him to 10 days in jail. On that same day and defendant already having been convicted for violating § 260 of the Penal Code, at the request of the defense, the judge set aside the judgment for contempt and set a subsequent date for its reading. On June 12, 1969, defendant was again sentenced to serve 10 days in jail for contempt, describing in said judgment the acts constituting contempt, its circumstances and place and that the acts occurred during the trial held for defendant. See

*Ramos* v. *Rivera*, 68 P.R.R. 509 (1948) and *Coll Moya* v. *Warden, Municipal Jail*, 89 P.R.R. 221 (1963).

The judgments appealed from will be affirmed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Santana Becerra did not participate herein.